ELIZA DAVIS *v.* THE STATE.

1. EVIDENCE—ACCOMPLICE.—Article 219 of the Penal Code (Pasc. Dig., Art. 1814) defines accomplices in a technical sense, but does not furnish the criterion to determine who is an accomplice, within the meaning of Article 653 of the Code of Criminal Procedure (Pasc. Dig., Art. 3118), which interdicts a conviction on uncorroborated evidence of an accomplice. This latter Article applies, not only to technical accomplices, but to all *particepes criminis*, whether as principals or otherwise.

2. SAME.—To warrant a conviction upon an accomplice's testimony, the corroboration must not be limited to the *corpus delicti*, but must also tend to connect the accused with the commission of the offense.

3. SAME—CHARGE OF THE COURT.—See testimony in this case which is held to necessitate corroboration of a witness who implicated himself only by a coerced acquiescence in the crime, and which made it incumbent on the court below, whether asked or not, to give in charge to the jury the law governing testimony of accomplices.

4. ADMISSIONS of a party in jail, or in custody of an officer, are not legal evidence unless voluntarily made by the party after he was cautioned that they might be used against him, or unless, in connection with the admission, he stated facts or circumstances found to be true, and conducing to establish his guilt.

5. NOTE the peculiar facts of the present case, under which the court below correctly allowed certain statements and acts of a co-defendant, in custody but not on trial, to be adduced in evidence against the prisoner at the bar.

APPEAL from the District Court of Hunt. Tried below before the Hon. G. J. CLARK.

This record discloses a case of a peculiar and remarkable character, necessitating a careful statement of the facts.

The indictment was filed in the court below on January 25, 1877. It charged that James A. Morris, S. L. Morris, Jasper Morris, W. M. McComas, J. D. Marse, and Mrs. Eliza Davis, the appellant, did, on January 9, 1876, murder a peddler named Miller, with an ax. The appellant is the mother of the three Morrises, and they lived with her. Marse and McComas were not related to the other defendants. The appellant alone was on trial.

The body of the peddler was not found, and the evidence that such a man was killed rests almost entirely upon the testimony of W. J. Miller, the son-in-law of the appellant, and the witness whose testimony is held by this court to be that of an accomplice.

W. J. Miller, for the state, testified that Mrs. Davis, the prisoner at the bar, was his mother-in-law, who lived in what is know as the Jernigan Thicket, in Hunt county, and about half a mile from the Fannin county line; that in the early part of January, 1876, witness and his wife were living with the prisoner; that on the evening of January 10, 1876, witness returned home and there found one Miller, a peddler of tin and stoneware, who was driving a "thimble-skein," two-horse wagon, with a sorrel mare-mule and a black horse-mule. Witness heard Miller, the peddler, say he wanted to buy about $500 worth of 'hides and honey; Mrs. Davis insisted that he should stay all night, as she did not have time to get her honey that evening; Miller put up to stay all night, and, besides him and Mrs. Davis, there were in the house witness and his wife, Sue Glover, and the several co-defendants who are joined in the indictment with Mrs. Davis.

Miller, the peddler, occupied a bed made for him on the floor. Witness and his wife slept in the same room, as did also Mrs. Davis. After sleeping a short time witness awoke and heard whispering on the outside of the house, but could not understand what was said. In a short

time Jasper Morris came in and struck a light, and James and Levi Morris, McComas, and Marse were present, when witness saw James Morris "raise an ax and stave it into Miller's head." Witness was lying in bed. Miller struggled but little, and died immediately. Witness lay in his bed until James Morris ordered him three times to get up, and cocked a pistol on him. Mrs. Davis, the prisoner, was sitting up in her bed, and "told the boys to make witness go with them," to prevent him from leaving.

They tied up Miller's head in a coffee-sack, and searched him, and witness heard one of the boys say they had got only $56, and another proposed to count the money over again and see if there were not some larger bills than they thought. After the deceased was searched he was carried out and tied on a gray mare claimed by Mrs. Davis. McComas rode the mare. They made witness go along, and he was afraid not to do so. The three Morris boys, McComas, Marse, and witness went off into the thicket, taking the body along on the mare.

The witness gave an account of the route taken with the corpse, which they carried across the county line and into the county of Delta, until they came to a large thicket, about a mile and a-half from Mrs. Davis' house, where they dug a hole in the ground with an ax and a hoe, and rolled the body into it. Close by was a large rats' nest about three feet high. After putting the body into the hole one of the boys remarked that he did not believe they could get all the dirt back into it, and McComas tramped the dirt in over the body; and they then took about half the rat-nest and put it over the grave, and thus concealed all appearance of an interment at the spot.

Witness was kept under guard by the others, and on their way back told them that, if they would let him have his wife and leave there in the morning, he would do so and say nothing about the matter; that he did not want to stay

there if they were going to carry on this kind of conduct. They said that if he attempted to leave there they would kill him and put him by the side of the other Miller, and then there would be two Millers together.

After getting back to the house they took the mules and wagon about a quarter of a mile, into a little skirt of timber, and the second night afterwards James and Levi Morris and Joe Marse started off with the wagon and mules. Besides getting the peddler's wagon, team, money, and a bundle of papers, there was taken from the wagon, by the old lady and two of the boys, a lot of crockery and tinware. There were four large stone churns, several small milk-jars, a stack of tin baking-plates, and a large, deep tin pan. Witness thinks the figure "3" was on one of the churns. A lot of crockery and tinware being brought into court by the sheriff and exhibited to the witness, he thought they were the same he had been speaking of, but could not be positive. Among the lot was a stone jar with the figure "3" upon it.

Witness described the deceased as a low, heavy-set man, thirty or thirty-five years old, five feet six or seven inches high, dark, sallow complexion, with black hair and whiskers; and witness took him to be a Dutchman. He asked witness his name, and, on being answered that it was Miller, said that was his name, and jocularly remarked that he and witness were kin. Before night, on the day of the killing, the deceased spoke of leaving, and Mrs. Davis and the boys insisted on his staying all night; and witness noticed Mrs. Davis and the boys whispering to each other several times during the evening. In removing the body they first tried to put it on McComas' horse, but the animal would not carry it, and then Mrs. Davis "told the boys to go out to the lot and catch Polly Ann—that she would carry such as that; and they then went to the lot and caught the gray mare, and she carried the body."

When James Morris struck the peddler's head with the

ax, witness' wife, who was in bed with him, began to cry,
when Mrs. Davis told her to hush up that crying, and that
if she came there and boxed her she would get something
to cry for.    She told the boys to look on the loom for the
coffee-sack with which to tie up the head of the deceased.

Witness married the prisoner's daughter about eleven
months before the murder, and lived with the family until
January 17, 1876 (seven days after the killing), when he
escaped with his child on his back to Mr. Richardson's, and
asked his protection.    The boys had kept him under guard
subsequent to the murder, and had followed him and his
wife, on an attempt made by them to escape, and made
them go back.

In the spring succeeding the killing, witness went with
S. Hawkins to hunt the peddler's grave, but they did not
find it.    Hawkins dug a hole, but it proved not to be
the grave.    Afterwards witness went with J. J. Smith and
others and found the grave, after looking for it some time.
Witness described certain trees and surroundings by which
he identified the spot, and which he had previously described
to Smith; one of the trees still bearing a mark which,
according to the witness, was bitten on it, the night of the
murder, by the gray mare which carried the dead peddler,
while she was hitched to the tree and while the party were
putting him in the ground.    No remains of the deceased,
however, were found in the spot thus identified by the wit-
ness Miller.

During his cross-examination this witness was asked
whether or not, on July 4, 1876, he told J. J. Matthews,
one of the defendant's attorneys, that if he would influence
witness' wife to live with him, he would pay the attorney
$200 and swear so as to clear Mrs. Davis and her sons.
The question was objected to and disallowed, because not
pertinent to the issue.

The foregoing version of the testimony of the witness is

greatly condensed from the statement of facts, by the omis-
sion of many details and much repetition ; but it is believed
that nothing of importance has been overlooked.

At the close of the statement of facts is found a written
agreement made by counsel for the state and for the accused .
which, from the stand-point of the defense, seems calculated
to cast a strong side-light on the witness Miller and his testi-
mony.  It shows that on January, 20, 1876, he made affi-
davit before a justice of the peace, charging the three Morris
boys with theft of cattle, and causing them to be confined
in jail until the March term, 1876, of the district court,
when the grand jury found no indictments against them, and
they were released.   That the said grand jury, on evidence
of the Morrises, found two indictments against Miller for
misdemeanors, and he was committed to jail, but was sub-
sequently tried and acquitted of one of the indictments, but
remained in jail under the other until he made complaint
charging the defendants in the present case with the mur-
der of the peddler ; whereupon he was bailed out of jail,
and the second indictment against him suffered to drop.

Jack Downs, for the state, proved that in the early part
of January, 1876, if not mistaken in the time, he saw very
much such a Dutch peddler of stone and tinware as Miller
described, and that the peddler was driving such a wagon
and team as those described by Miller.   Witness saw the
peddler and his outfit at witness' blacksmith-shop in Hunt
county, but some eight or nine miles distant from Mrs.
Davis' place, and on a public road which did not lead to her
place.

J. P. Watson, for the state, testified that previous to the
arrest of Mrs. Davis he, as a deputy sheriff, executed a
search-warrant at her house, and seized the crockery and tin-
ware exhibited to the witness Miller.   Mrs. Davis said she
got the ware from the peddler.   Witness asked what peddler,
and some one, witness thinks Mrs. Davis, replied, "I will

38

not tell you." Among the lot was a stone churn, which she said she bought of one Lazarrotte, in the town of Ladonia. The ware was new when witness seized it.

J. J. Smith, for the state, testified that he was a deputy sheriff, and had accompanied the witness Miller to hunt the peddler's grave. A number of others were in the party. Miller had previously described to witness the grave and the route by which the deceased was conveyed to it. Witness gave a detailed account of the search for the grave, and of its discovery by himself, verified by Miller. It was overgrown with grass, and with honey-locust six inches high. Witness got down on his knees and commenced removing with his hands the dirt, trash, and rat-nest which nearly filled it. In this process he unearthed no other remains than a sickeningly offensive stench. He found roots which had been severed before the sap rose, and some which had been broken since the sap rose, as indicated by the bark. Miller showed to witness the ash tree bitten by the gray mare the night the peddler was buried there, and the other trees to which the party had tied their horses. Witness found several tracks which looked like horse-tracks, one of which led towards the ash tree. The grave was about five and a-half feet long and a foot and a-half deep. This was about June 15, 1876.

This witness gives an account of a conversation which the witness Miller was allowed to have with Mrs. Davis in the dungeon where she was confined. The witness slipped up behind the dungeon door for the purpose of overhearing the conversation. It appears by the bill of exceptions that this testimony was objected to because Mrs. Davis was in jail when the conversation occurred; and in the first instance the objection was sustained, according to the bill of exceptions, which then proceeds to state that " thereupon, in the absence of the jury, N. J. Ross, sheriff of said county, was introduced and testified as set forth in the statement of facts,

and the testimony of W. J. Miller was referred to as to who struck the deceased with the ax; and thereupon the court overruled the objections and permitted the testimony to go to the jury."

In the conversation as related, Mrs. Davis said to Miller, " William, what did you swear a lie for when you swore I struck the peddler in the head with the ax? You know nobody held the ax but Jimmy." Miller told her he did not swear that. She said the writ read that way, and Miller replied that he was told it had to be put in that way. She said, " Well, they can't make anything out of it; they won't find the body if they find the grave, for the boys had taken it up and carried it across the creek when they were turned out of jail." This conversation, according to the witness, occurred before he and Miller found the grave, and subsequent to the release of the Morris boys, about the last of March, 1876, from the jail in which they had been confined since the last of the preceding January on a charge of cattle stealing. On the present charge of murder they were arrested in May, 1876.

Witness thought he heard the entire conversation between Mrs. Davis and Miller, and did not think that Miller knew he was listening to it, but admitted that Miller could have seen him while it was going on.

S. O. Richardson, for the state, testified that he accompanied Smith and Miller in their hunt for the peddler's grave, and gave an account of the search and discovery very similar to that given by Smith. From appearances, it had been dug in the winter and afterwards had been interfered with in the spring. The smell was very offensive. Witness had smelled dead rats, horses, hogs, and other animals, but pronounced them less offensive than this dirt, which, he said, smelled like a decayed human body. He had smelled such bodies before, and found them more offensive than any other carrion. He admitted, however,

that he was mentally prepared to think that the dirt smelled like a human carcass.

N. J. Ross, sheriff of the county, testifying for the state, said that after the grave was found he went to Jernigan Thicket, taking with him Joe Marse, one of the parties indicted. They were on a search for the peddler's body, and there was a large crowd along. Some of them reported the finding of a place where there were the remains of a fire and some bones. Under the direction of Marse, witness found a place about a mile and a-half from the grave, across a creek, where there was a large bed of ashes, and bones among them. Witness found several teeth and some bones, which he brought back with him, but they crumbled so that he could not get them examined.

S. M. Hawkins, for the state, testified that in the spring of 1876 he was a deputy sheriff, and, in company with W. J. Miller and a large crowd of others, made the first hunt for the peddler's grave. They did not find the grave, but witness dug a hole about three feet long and two wide in the edge of a rat-nest. Miller was present, and said that was not the place. After the grave was found by Smith and Miller, witness was shown it by the witness Richardson. It was at least 150 yards from the hole witness had dug. Witness cleaned the grave out and measured it accurately, and found it to be five feet four inches long, sixteen inches deep, and twenty-two inches wide.

This closed the evidence in chief for the state.

N. E. Miller, wife of the prosecuting witness W. J. Miller and daughter of Mrs. Davis, was the first witness for the defense. She denied *in toto* the testimony of her husband in respect of the killing of the peddler. Since her marriage she had seen but one peddler at her mother's house, and from him her mother bought some crockery and tinware, and paid him with honey and butter. The ware previously exhibited to her husband and to deputy sheriff

Smith was recognized by her as the same ware purchased from the peddler, whose name, witness thought, was John Cameron. The purchase of it by her mother was made in August, 1875. During the early part of January, 1876, and up to the 17th of that month, witness and her husband lived together at her mother's house, and were generally there at night. During that time no peddler stopped there to stay all night, or was killed there. She and her husband were not living together at the time of the trial.

On cross-examination, and to lay the predicate for discrediting this witness by contradiction, counsel for the state asked her whether, on May 23, 1876, while she was detained in jail as a witness, she had a conversation with her husband in the presence of J. J. Smith, one of the witnesses for the state. The defense objected to the question on the ground of privileged communications; but the court overruled the objection and allowed the state's counsel to proceed. Having answered that she did, while so in jail, have a conversation with her husband, she was asked whether she then told him he had sworn a lie in swearing that her mother had stuck the ax in the Dutchman's head, when he knew that no one but Jimmy did it; that she knew he had so sworn because the warrant read that way; that she would not live with him if he was the last man in the world, but would have gone with him if he had left the country, as he should have done, but that she would stick by her mother and brothers if they all went to the penitentiary together.

Witness denied this version of what she told her husband, but said that she did tell him he had sworn lies against her mother and brothers, and could not expect her to live with him after doing so; and witness knew that Smith, the deputy sheriff and jailer, did not hear the conversation.

The state, in rebuttal, recalled the witness Smith, who swore that in the conversation between Mrs. Miller and her husband, in the jail, on the occasion testified to by her, she

did use to her husband the substantial language imputed to
her by the cross-examining counsel.

Isaphine Morris, wife of Jasper Morris, one of the sons
and co-defendants of Mrs. Davis, testified that in Decem-
ber, 1875, her husband sold their place, and they went to
live with Mrs. Davis, his mother, and lived with her during
January, 1876; and that from the 1st of that month until
the 17th, when W. J. Miller left there, witness passed
every night in the house, and during that month she neither
saw nor heard of any peddler being or putting up there,
or of any one being killed there. Witness recognized the
stone and tinware exhibited in court as property of Mrs.
Davis, which witness first saw at Mrs. Davis' house in
August, 1875, and which was there in December, 1875,
and there remained until it was taken away by the deputy
sheriff.

On cross-examination the witness admitted that she might
have been absent from Mrs. Davis' one night during the
early part of January, 1876, but was positive that, if she
was so absent, her husband was with her.

John Cameron, for the defense, testified that in the sum-
mer of 1875 he was peddling stone and tinware, and about
the last of July, 1875, sold Mrs. Davis, at her house, some
of both kinds; could not be positive that the ware exhibited
in court is the same he sold her, but it is like it, and just
about such a bill of ware as he sold her. Witness distinctly
identifies one of the jars exhibited; Mrs. Davis tried to
"jew" him on it because of the crack in it. She paid him
in honey and a little butter. Witness had been all over the
country from Shreveport to Fort Worth, though there
might be a few neighborhoods he had not been in; and in
his travels he became acquainted with many peddlers in his
own line of business, but had never heard of a German
peddler of stone and tinware named Miller. Witness was
peddling during the month of January, 1876, but does not

remember whether he was about the Jernigan Thicket during that month.

John Campbell, his wife, and Z. J. Ross, for the defense, concurred in testifying that in January, 1876, Ross was building a house for Campbell, and had Marse, McComas, and Levi Morris (co-defendants of Mrs. Davis) employed to help him ; that they boarded and lodged at Campbell's, which was about two and a-half miles from Mrs. Davis' ; and that they took supper at Campbell's the evening of Monday, January 10, 1876, and stayed there that night. Campbell knew the dates because he charged Ross for the board of his employés, and kept a memorandum to settle by.   These three witnesses gave other testimony respecting the movements of Marse, McComas, and Levi Morris for several nights before and after January 10, 1877, contradictory of statements made by Miller ; and the defense examined five other witnesses, connections of one or more of the defendants, and proved collateral facts tending to the same end.

Some eight witnesses who had aided in the hunt for the peddler's grave were examined by the defense.   The general effect of their testimony showed that, for several weeks in the spring of 1876, crowds resorted to Jernigan Thicket in search of the grave, and dug holes into the rat-nests, which appear to have abounded there.   Several of these witnesses had examined the grave reported by Smith and Miller, and said it was less than five feet long, and not a foot in depth, and was dug like a bread-tray.   Two or three of them pronounced the stench from it to be characteristic of the rat-nests ; and about the same number testified that the character of W. J. Miller for truth and veracity was bad.   Two or more of them testified that the defendant McComas had no horse in January, 1876, in contradiction of statements of Miller.

B. Merrill, for the defense, stated that he knew a man by the name of Miller who, in January, 1876, had a thimble-skein, two-horse wagon, and two mules, one a sorrel and the other a black. He was at witness' house, about two and a-half miles from Mrs. Davis', sometime between the 1st and 15th of January, 1876. He looked like a Northern man, and was still living about six miles from witness. The witness Miller was frequently out upon Merrill's Prairie about the time the other Miller was there.

Dr. J. C. Gee, for the defense, proved that in 1876 he was called upon to examine a lot of bones which, as he was informed, had been brought from the Jernigan Thicket. They were so burnt that he could not tell much about them, but in the lot there was one which he could say was not the bone of a human, and which he pronounced the bone of a sheep. Ross, the sheriff, was present, and had another parcel of charred bones, but they were so badly burned that nothing could be ascertained by examining them.

Dr. J. Scoonover, for the defense, was called upon in July, 1876, to inspect a lot of bones said to have been brought from the Jernigan Thicket. With the exception of one, they were too badly burned for identification; but that one he pronounced to be the bone of a sheep or a deer.

The jury found Mrs. Davis guilty of murder in the first degree, and, exercising the power conferred on juries in capital cases by the Constitution of 1869, which was still in force in January, 1876, assessed her punishment at confinement in the penitentiary during her life. A motion for a new trial was made and overruled. In the opinion of this court will be found such other matters of fact as may be material to a clear understanding of the legal questions determined.

It is not explained by the record why Sue Glover, who, according to Miller's testimony, was at Mrs. Davis' house

the night of the murder, was not examined as a witness in the case. The record shows that she was a little girl, but does not state her age.

*Jones & Lewis*, and *Upthegrove & Cushman*, for the appellant, insisted that, under Article 2205 of Paschal's Digest (Penal Code, Art. 544), the proof of the *corpus delicti* was insufficient, by reason of the failure to find and identify the body of the deceased; citing *Taylor* v. *The State*, 35 Texas, 112; *Wilson* v. *The State*, 43 Texas, 476; and *Brown* v. *The State*, 1 Texas Ct. of App. 154

That the witness Miller was an accomplice, and not sufficiently corroborated; citing *Roberts* v. *The State*, 44 Texas, 119; *Coleman* v. *The State*, 44 Texas, 109; *Irwin* v. *The State*, 1 Texas Ct. of App. 302; and *Kelly* v. *The State*, 1 Texas Ct. of App. 628.

*George McCormick*, Assistant Attorney General, for the State, maintained: As the fact of the killing does not depend on the disappearance of the deceased, Article 2205, Paschal's Digest, does not apply; and, as there was an eye-witness of the homicide, the discovery and identification of the body was not necessary. Roscoe's Cr. Ev., sec. 651; 2 Hale's P. C. 290.

Confessions obtained by artifice, without threat or promise, are admissible. Roscoe's Cr. Ev. 47.

The statements made by the appellant to the witness Miller, and overheard and proved by the witness Smith, were corroborated, as to the fact of the killing, by the testimony of Miller, and were evidence. *Selvidge* v. *The State*, 30 Texas, 59; *Warren* v. *The State*, 29 Texas, 370; *Strait* v. *The State*, 43 Texas, 488.

Winkler, J. The appellant and five others, James A. Morris, S. L. Morris, Jasper Morris, W. M. McComas, and I. D. Marse by name, were jointly indicted by the grand

jury of Hunt county, for the murder of a man described in the indictment as "one —— Miller, a peddler," whose christian name, it is alleged, is to the grand jurors unknown, charged to have been committed in the county of Hunt, on January 9, 1876.

In the judgment entry, under date of July 16, 1877, which it is stated was the day set for the trial, the court, on the motion of the defendants, granted a severance, and after the defendants had been arraigned and had pleaded not guilty, this appellant was put upon her separate trial. The trial, which was commenced on the 16th, continued through the intermediate days until July 21, 1877, when the jury returned a verdict against the accused of murder in the first degree, and assessed her punishment at confinement in the penitentiary during her natural life; upon which verdict judgment was entered accordingly.

A motion for new trial was made, which being overruled by the court, the defendant excepted, and in open court gave notice of appeal.

We have examined with the greatest possible care every feature of this strangely interesting case, as presented by the record, aided by the able written and oral arguments of counsel on both sides, in order that we might determine understandingly the merits of this appeal, and have arrived at the conclusion that the most material, if not the only, subject for consideration, and which must be decisive of the case for the present, is as to the sufficiency of the charge of the court given to the jury on the trial below.

We propose, therefore, to consider the question of the sufficiency of the charge in the light of the evidence set out in the record, and, testing it by the established rules of law, determine whether or not the instructions given by the court were the law of the case as made by the proofs, and by which the jury were to be guided in determining the guilt or innocence of the defendant.

It is conceded that if the principal state's witness, W. J. Miller, is to be fully credited, a most atrocious murder was committed at the house of the accused on the night of January 10, 1876, and that the accused was there present, aiding by words and gestures those engaged in the perpetration of a most horrid crime, and with a full knowledge and understanding of their wicked intention.

But, withdrawing the mind from the contemplation of the heinousness of the offense, and looking at the whole case and the evidence of the other witnesses, the question forces itself upon us, Was not this state's witness also a guilty participant in the commission of the crime?

This witness attempts to exculpate himself by saying that he was compelled, by threats against his own life, to take the part he did. Aside from this, there is as much evidence against him as there is against the accused herself. At any rate, the evidence, taken as a whole, was of such a character as to have required of the presiding judge a proper instruction to the jury on the subject of accomplices, and the weight to be given by the jury to the evidence of an accomplice, as an important part of the law applicable to the case as made by the evidence. The failure of the judge so to charge was a material error, necessarily to the prejudice of the accused.

In every criminal case it is the duty of the judge who presides at the trial to deliver to the jury a written charge, in which he shall distinctly set forth the law applicable to the case; and in cases of felony it is made the duty of the judge to give this charge whether asked so to do or not. Code Cr. Proc., Art. 594 (Pasc. Dig., Art. 3059).

The whole charge is to be taken together and construed with reference to the facts. *Johnson* v. *The State*, 27 Texas, 706.

The expression employed in the Code, to wit, "the law applicable to the case," has uniformly been construed to

mean the case as made by the evidence. *Hudson* v. *The State*, 40 Texas, 15 ; *Holden* v. *The State*, 1 Texas Ct. of App. 235.

Treating of the subject as to common law, a standard author says : " By the common law the rule seems to be, ' the degree of credit which ought to be given to the testimony of an accomplice is matter exclusively within the province of the jury.' It has sometimes been said that they ought not to believe him unless his testimony is corroborated by other evidence ; and without doubt great caution in weighing such testimony is dictated by prudence and good reason. But there is no such rule of law ; it being expressly conceded that the jury may, if they please, act upon the evidence of the accomplice without any confirmation of his statement. But, on the other hand, judges in their discretion will advise the jury not to convict of felony upon the testimony of an accomplice alone and without corroboration ; and it is now so generally the practice to give them such advice that its omission would be regarded as an omission of duty on the part of the judge ; and, considering the respect always paid by the jury to this advice given from the bench, it may be regarded as the settled course of practice not to convict a person in case of felony upon the sole and uncorroborated testimony of an accomplice. The judges do not in such case withdraw the cause from the jury by positive direction to acquit, but only advise them not to give credit to the testimony." 1 Greenl. on Ev., sec. 380.

If, then, it would be regarded as an omission of duty on the part of the judge not to advise the jury in a case of felony that they should not convict on the testimony of an accomplice without corroboration, when, according to the learned author, there was no such rule of law, but only regarded as settled practice, with how much greater force the omission would apply when, as under the provisions of our Code, it is expressly provided that " a conviction can-

not be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed ; and the corroboration is not sufficient if it merely shows the commission of the offense.'' Pasc. Dig., Art. 3118.

The corroboration must be as to a material matter. *Bruton* v. *The State*, 21 Texas, 337.

The Penal Code, Article 219 (Pasc. Dig., Art. 1814), defines who are accomplices in a technical sense, but this is not the criterion by which to determine whether one is an accomplice in the sense of requiring corroboration of his testimony to convict.

The provisions of Article 653 of the Code of Criminal Procedure, requiring corroboration to convict, apply, not only to those persons mentioned in Article 1814, who are technically accomplices, but applies as well to *particepes criminis*, principal and joint offenders, and accessories. All persons who have participated in the commission of a crime, whether principal offenders, or more remotely connected with the commission of the particular offense in which such person's testimony may be offered, come within the rule requiring corroboration to justify a conviction. *Barrara* v. *The State*, 42 Texas, 260 ; *Williams and Smith* v. *The State*, 42 Texas, 322 ; *Irwin* v. *The State*, 1 Texas Ct. of App. 301, and cases there cited.

The authorities cited above clearly establish these legal propositions :

1st. That, in so far as the question of evidence is concerned, all persons are accomplices, upon whose uncorroborated evidence a conviction cannot be sustained, when they stand in the relation of principal offenders, as defined in Articles 214–218 of the Penal Code (Pasc. Dig., Arts. 1809 to 1813, inclusive), or where they stand in the technical relation of accessories, as defined in Article 219 and the other

Articles of the Code embraced in chapter 2, commencing with Article 2814 of Paschal's Digest.

2d. That, to justify a conviction of crime on the testimony of an accomplice as above defined, such testimony must be corroborated by other evidence, not only of the fact that the crime charged has been committed, but the corroborating evidence must tend to connect the defendant with the commission of the offense.

It is a settled rule of law that no conviction can be obtained on the testimony of an accomplice alone, when his evidence is not corroborated by other testimony showing that the accused was engaged in the transaction which forms the subject-matter of the charge under investigation. *Wright* v. *The State*, 43 Texas, 170.

The evidence set out in the transcript was of such a character as, in our opinion, to have suggested, not only the propriety, but the necessity, of directing the attention of the jury specially to this view of the case; and the failure on the part of the judge to so charge must be regarded as a failure to charge the law of the case, well calculated to prejudice the rights of the defendant.

On the trial evidence was admitted, over objections of the defendant's counsel, as to certain confessions or statements made by the defendant during her confinement in jail, and like statements and certain *data* furnished by another defendant whilst in custody of the sheriff; which was objected to by counsel for the defendant, on the ground that the testimony was not permissible owing to the situation in which the parties making the admissions or confessions were placed at the time the disclosures were made; and to the ruling of the court on the subject bills of exceptions were taken.

The question of the admissibility of this evidence must depend upon the law as laid down in the Code on the sub-

ject of admissions, subject to the rules requiring corroboration of testimony coming from accomplices.

"At common law," says Mr. Greenleaf, "it is generally agreed that deliberate confessions of guilt are among the most effectual proofs in law. Their value depends on the supposition that they are deliberate and voluntary, and on presumption that a rational being will not make admissions prejudicial to his interest and safety unless they were prompted by truth and conscience. Such confessions, so made by a prisoner to any person, at any moment of time, at any place, subsequent to the perpetration of the crime, and previous to his examination before the magistrate, are at common law received in evidence as among the proofs of guilt." 1 Greenl. on Ev., sec. 215.

But this quotation from the text is preceded by another equally important to be observed, as follows: "But here, also, as we have before remarked in regard to admissions, the evidence of verbal confessions of guilt is to be *received with great caution.* For, besides the danger of mistake from misapprehension of witnesses, the misuse of words, the failure of the party to express his own meaning, and the infirmity of memory, it should be recollected that the mind of the prisoner himself is oppressed by the calamity of his situation, and that he is often influenced by motives of hope or fear to make an untrue confession. The zeal, too, which so generally prevails to detect offenders, especially in cases of aggravated guilt, and a strong disposition in the persons engaged in the pursuit of evidence to rely on slight grounds of suspicion, which are exaggerated into sufficient proof, together with the character of persons necessarily called as witnesses in cases of secret and atrocious crimes, all tend to impair the value of this kind of evidence, and sometimes lead to its rejection when in civil actions it would have been received." 1 Greenl. on Ev. 214.

These common-law rules have been modified by our Code

in some important respects. The general rule of the Code is this : The confession of a defendant may be used in evidence against him if it appear that the same was freely made, without compulsion or persuasion, under the following rules, to wit: the confession shall not be used if at the time it was made the defendant was in jail or other place of confinement, nor while he is in custody of an officer, unless such confession be made in the voluntary statement of the accused, taken before an examining court in accordance with law, or be made voluntarily after having been first cautioned that it may be used against him ; or unless, in connection with such confession, he make statements of facts or of circumstances that are found to be true, which conduce to establish his guilt, such as the finding of secreted or stolen property, or instruments with which he states the offense was committed. Arts. 661, 662, Code Cr. Proc. (Pasc. Dig., Arts. 3126, 3127).

It appearing from the record that the confession or admission said to have been made by the defendant was made whilst she was confined in jail, and that that of an alleged *particeps criminis* was made whilst he was in the custody of the sheriff, and neither having been made in a voluntary statement before an examining court, they could only be admitted under one of the other two circumstances named with regard to statements made by one in jail or in custody of an officer, to wit: 1st, that the statement attempted to be proved had been voluntarily made after the person making it had been first cautioned that it might be used against him ; or, 2d, that it appeared in connection with such confession that the party making it made statement of facts or circumstances that are found to be true, which conduce to establish the guilt of the accused.

It is not made to appear that the statements of the defendant then on trial, or those of the man Marse, the one in jail and the other in custody of the sheriff, were made volun-

tarily after the parties had been first cautioned that the statement might be used against them, or that they had been so cautioned at all; and, therefore, the statements did not come within the first qualification as set out above, and were not admissible on that ground.

We are of opinion, however, that the statements of both Mrs. Davis and Marse, and the actions of Marse, and which were found to be true, did conduce remotely to connect this defendant with the commission of the offense charged, and on this ground the court did not err in permitting the testimony to go to the jury for what it was worth.

It must, however, be borne in mind that the statements of the defendant were proved, in part at least, by the state's witness Miller, heretofore mentioned in connection with the subjects of accomplices, and the evidence furnished by the statements and acts of Marse originated with one jointly indicted with the defendant; so, on a subsequent trial, if the evidence shall require an instruction to the jury on the subject of accomplices, such instruction should also embrace the subject of these statements or confessions, if the evidence should be as on this trial. The question of the admissibility of the evidence was for the court. The effect of the evidence, like all questions as to the effect of evidence, was for the consideration of the jury, taken in connection with the other facts and circumstances in evidence, and under proper instructions by the court.

It is not attempted to consider the evidence as to its sufficiency to support the finding of the jury, for the reason that the case must be remanded for a new trial on account of the failure of the judge to properly instruct the jury as to the law governing the subject of evidence by accomplices.

We may be permitted, however, to say that, aside from the evidence of the state's witness Miller, there is not sufficient evidence to sustain the verdict. It was error in the

39

court to exclude the testimony of the witness called to support the credit of Mrs. Miller, whose testimony, it seems, was attacked on the trial, as shown by a bill of exceptions. The error was, however, rendered in a great measure immaterial by the admission by the county attorney that the witness was credible. Other questions presented by the record have not been considered, for the reason that they are not likely to occur on another trial.

For the want of a proper charge on the subject of the testimony of accomplices, the judgment must be reversed and the cause remanded.

*Reversed and remanded.*